IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTINE A. BRADY,                   :      CIVIL ACTION
                                      :      No. 13-6008
          Plaintiff,                  :
                                      :
     v.                               :
                                      :
UNITED REFRIGERATION, INC.,           :
et al.,                               :
                                      :
          Defendants.                 :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                               June 3, 2015

          Plaintiff Christine A. Brady ("Plaintiff") brings this
action against Defendants United Refrigeration, Inc. ("URI") and
Barbara A. Keenan (collectively, "Defendants"), alleging
interference and retaliation under the Family and Medical Leave
Act ("FMLA"), as well as disability discrimination and
harassment[1] under the Americans with Disabilities Act ("ADA") and
the Pennsylvania Human Relations Act ("PHRA"). Defendants have
moved for summary judgment, and, for the reasons that follow,
the Court will deny the motion.

---

[1]      As Plaintiff "agrees to voluntarily dismiss her
disability harassment claim," the Court will dismiss the claim.
Pl.'s Resp. 22, ECF No. 12.

## I.  **FACTUAL BACKGROUND**[2]

Plaintiff was employed by URI as a credit manager from May 2001 through October 2011. Compl. ¶ 11. As a credit manager, Plaintiff was responsible for, inter alia, making credit decisions for customer accounts, collecting past-due balances from accounts, resolving disputes that may delay or prevent payment of past-due balances, and recommending write-offs of uncollectible balances. Pl.'s Resp. Ex. 2, Job Description. In practice, as expressed by Plaintiff's former supervisor, Bob Senior, a credit manager's "job is primarily to be on the phone with customers, with salespeople, [and] with branch managers." Pl.'s Resp. Ex. 3, Senior Dep. 58:9-16, Apr. 2, 2014. URI's credit managers interact with each other frequently, answering calls for other credit manager who are already on the telephone, relaying information to each other, etc.--"[s]o visual, verbal contact [among credit managers] is important." Id. 58:5-20.

Plaintiff alleges that for the last decade or so, she has suffered from heightened sensitivity to perfumes, fragrant chemicals, and lotions. Pl.'s Resp. Ex. 1, Pl.'s Dep. 61:23-62:1, Mar. 26, 2014. Over the years, Dr. Yana Saknovsky has treated Plaintiff, id. 63:7-14, and has prescribed antihistamines,

---

[2]    In accordance with the appropriate standard of review for motions for summary judgment, the Court views the facts in the light most favorable to the Plaintiff, the nonmoving party.

inhalers, and nasal sprays for her condition, id. 62:4-18--a
condition that Dr. Saknovsky's notes characterize as "[s]ome
type of allergy," Pl.'s Resp. Ex. 15, Progress Report.[3] As far
back as 2006, Plaintiff started getting headaches "a few times a
week" as a result of her condition. Pl.'s Resp. Ex. 1, Pl.'s
Dep. 77:4-15. Plaintiff's headaches can last from half an hour
to a few hours, id. 76:9-14, and are often accompanied by nausea,
coughing, burning of the throat, and difficulty concentrating,
id. 73:3-14. By 2009, her symptoms worsened. Id. 77:18.

On December 7, 2010, Plaintiff emailed Barbara Keenan
(URI's Human Resources Manager), informing her for the first
time[4] that she suffered from "multiple chemical sensitivity"
("MSC") to perfumes and other fragrances, and asking "if there
is a way to have a fragrance free zone or [if she] could be
placed in a fragrance free area." See Pl.'s Resp. Ex. 23, Email
Exchange, Dec. 7-8, 2010. From then until October 2011, URI took
various measures to accommodate her sensitivity, and Plaintiff,

---

[3]     Dr. Saknovsky's evaluation of Plaintiff's symptoms is
echoed in reports from 2009 of Plaintiff's visits with allergist
Dr. Rajan Ravikumar, see Pl.'s Resp. Exs. 16-17, Medical Reports,
ENT specialist Dr. Sondra Saull, see Pl.'s Resp. Ex. 18, Medical
Report, and Neurologist Dr. Randy Rosenberg, see Pl.'s Resp. Ex.
20, Medical Report.

[4]     In a message to Keenan following Plaintiff's initial
email, Senior informed her that "[a]fter asking Tina [Plaintiff]
to put her concerns in writing for several years, she finally
has." Pl.'s Resp. Ex. 24, Email Exchange, Dec. 7, 2010.

Keenan, and Senior exchanged frequent emails about the effectiveness of the measures and about the issues that often arose as a result of her condition.

Keenan responded to Plaintiff the day after she received her initial request, informing her that she was "looking into an electronic air cleaner for [her] desk." Id. That same day, Senior notified Keenan that the only available office to move Plaintiff's desk was "Bob Gordon's old office," and that "[i]f that is an option" he would "arrange for the move." Pl.'s Resp. Ex. 25, Email Exchange, December 8, 2010. Keenan responded that she spoke to Nick Hope (URI's Executive Vice President/General Manager), who she said would "be looking into a place to move her."[5] Pl.'s Resp. Ex. 27, Email Exchange, Dec. 8, 2010.

---

[5]     Around this time, Plaintiff asked Senior if she could be moved into a private office. Defs.' Br. Ex. A, Pl.'s Dep. 105:16-106:15. URI's headquarters building has a few offices and storage closets, but at that time, Plaintiff's superiors determined that none of the spaces were available or appropriate for her. See Defs.' Br. Ex. D, Hope Dep. 52:2-14, 53:1-20, Aug. 6, 2014. According to Senior and Hope, even if any of those offices or closets had been available, they would not have been suitable locations for Plaintiff, since she would have been out of visual proximity and earshot of the other credit managers. Id. at 55:19-56:4; Defs.' Br. Ex. B, Senior Dep. at 58:9-20, 78:12-14. Moreover, Hope also believed that giving Plaintiff a private office--when no other Credit Managers had a private office--would have "create[d] a morale problem with dissension and animus among the other employees." Defs.' Br. Ex. D, Hope Dep. 56:5-11. Indeed, Jim Karanzalis, another credit manager, testified that he felt that if Plaintiff had been given a private office, then he should have received one as well. Def.'s

On December 9, 2010, Plaintiff reiterated to Keenan that she "can not [sic] function with all these chemicals around [her]," Pl.'s Resp. Ex. 28, Email Exchange, Dec. 9, 2010, and on December 15, she provided Keenan with a note from Dr. Saknovsky stating that "[Patient] is under my care and is very sensitive to smells[, and] needs accommodations for a smell[-] free environment." Pl.'s Resp. Ex. 30, Doctor's Note, Dec. 15, 2010.

Keenan responded to Plaintiff's concerns on December 16, 2010, assuring her that URI "takes your sensitivity seriously. Therefore, we have provided you with a portable air purifier, we have moved you to another desk out of the main stream and we have distributed [a] memo to all employees on the first floor."[6] Pl.'s Resp. Ex. 31, Email, Dec. 16, 2010. Keenan's "No Fragrance Memo" reads as follows:

> Please be aware that perfume, cologne, and aftershave lotion are no longer permitted at work, as we have been notified that an employee is sensitive and allergic to fragrances. We are sorry if this causes an inconvenience, but it is important to be courteous to our fellow employees.
>
> Should you have any questions, please do not hesitate to contact me.

---

Ex. E, Karanzalis Dep. 55:18-56:7, Aug. 6, 2014 ("I was senior credit person. Whether that entitles me or not, I still felt if they were going to give an office I should be first.").

[6]     Since Keenan's office was on the second floor, away from the area in which Plaintiff worked, Keenan could not have known if anyone was wearing fragrances unless it was reported to her. See Defs.' Br. Ex. C, Keenan Dep. 66:8-14, Apr. 2, 2014.

Pl.'s Resp. Ex. 32, No Fragrance Memo, Dec. 16, 2010.[7]

Later in December, Plaintiff was moved to a new desk, see Pl.'s Resp. Ex. 1, Pl.'s Dep. 86:6-9--but one near Stephanie Mason, who Plaintiff alleges "wore perfume and lotions every day." Id. 92:22-93:14. After "a minor skirmish" between the two, Pl.'s Resp. 8, Keenan told Plaintiff that she should contact her rather than approaching coworkers directly. Pl.'s Resp. Ex. 39, Email Exchange, Jan. 26, 2011. Keenan also mentioned that the company could provide her with a filtering face mask "if [she] would like." Id. Although Plaintiff initially told Keenan "if you want to order me the face masks . . . that's fine," she refused to wear the masks once they were purchased. Pl.'s Resp. Ex. 1, Pl.'s Dep. 83:9-24.[8]

On February 16, 2011, Plaintiff notified Keenan it appeared that the No Fragrance Memo was being disregarded, and asked if Keenan could reiterate the policy. Pl.'s Resp. Ex. 40, Email Exchange, Feb. 17, 2011. Plaintiff also conveyed that she

---

[7]    According to Pam Szell, one of Plaintiff's peers, "[m]any people openly complained about [the no fragrance policy] to each other," though "not to management" to her knowledge. See Pl.'s Resp. Ex. 13, Szell Dep. 21:2-8, Aug. 6, 2014.

[8]    Plaintiff expressed to Dr. Saknovsky that she does not know how she would function with a face mask on. Pl.'s Resp. Ex. 1, Pl.'s Dep. 83:14-24. According to Plaintiff, Dr. Saknovsky told her "if you're going to be hyper about it, you don't have to wear that all day long." Id. 83:20-22.

preferred not to point out specific people as "it puts [her] in a bad position." Id. In response, Keenan again circulated the No Fragrance Memo. Pl.'s Resp. Ex. 41, No Fragrance Memo, Feb. 16, 2011. She distributed the memo a third time a few months later, Pl.'s Resp. Ex. 42, No Fragrance Memo, Apr. 14, 2011, as noncompliance issues continued to persist.[9]

In April Plaintiff discovered that Mason, whom Plaintiff had been sitting next to since December, was exempt from the no fragrance policy--as a result of a skin condition of her own. See Pl.'s Resp. Ex. 1, Pl.'s Dep. 95:14-97:9. That month, Plaintiff complained to Keenan about the aggravating effects of Mason's lotion,[10] although it was not until June that Mason's workstation was moved away from Plaintiff's "to the opposite side of the office." See id. 97:13-24.

On May 13, 2011, Plaintiff sent the following email to Keenan:

---

[9] Szell, one of Plaintiff's former colleagues, reported that some employees' "fragrance levels increased" with the memos. Pl.'s Resp. Ex. 13, Szell Dep. 23:15-18. Although Szell complained of this to Senior, she dropped the complaint when he essentially told her she would have to report her coworkers directly to HR. Id. 24:14-16.

[10] In response to Plaintiff's complaint, Keenan stated, "Well, you'll have to move to another area." Id. 99:1-2. Plaintiff replied, "[I]f I have to move over there, I will, but you will have to talk to the girls in AR [Accounts Receivable]." Id. 99:3-6. To Plaintiff's knowledge, Keenan never spoke with those employees, and Plaintiff did not move to the AR department. Id. 99:7-8.

It is unfortunate that I have to bring this subject up again; however, as you stated to me on the 13th of April that Stephanie has been permitted to use her fragrant [] lotion and powder due to her having a condition. I do understand, as I too have a condition that has been verified with a note submitted by my physician. Again, the problem with that is you moved me closest to the person who does not have to conform, not to mention the people who just continue to use very fragrant lotions and[/]or sprays, even after reiteration of the Perfume Policy. As per your email, I will not take it upon myself to bring it up with anyone.

I tried to use the air cleaner and the knob is completely broken. I have also been informed by my doctor that those machines can, and in a lot of instances make the situation worse. I am trying to deal with this the best I can, but it seems to get worse over here and I do not think I should have to wear face masks all day long because people will not conform, and nor does my doctor.[11]

I have left my doctor's note with Bob Senior (he is not in today) which takes me off of work for a short sick leave until May 25th.

Pl.'s Resp. Ex 43, Email Exchange, June 8, 2011. Accordingly,

Plaintiff was out on medical leave[12] from May 16 to May 25,

---

[11] As stated earlier, her doctor apparently told her "if you're going to be hyper about it, you don't have to wear that all day long." Pl.'s Resp. Ex. 1, Pl.'s Dep. 83:20-22.

[12] In addition to this leave of absence, Senior testified that there were numerous times where Plaintiff--citing her condition--would leave work early or take a day or more off of work. Pl.'s Resp. Ex. 3, Senior Dep. 70:11-71:23. Plaintiff points out, however, that aside from the vacation and sick days that she used, "she had a total of only five absences from June - October 2011," Pl.'s Resp. 17; see Pl.'s Resp. Ex. 62, 2011 Absentee Calendar, and upon her termination "she still ha[d] 7 ½ vacation days remaining," Pl.'s Resp. 17; see Pl.'s Resp. Ex. 63, Separation Form.

2011.[13] Pl.'s Resp. Ex. 44, Disability Certificate. On May 16,

URI issued a form notifying Plaintiff that she was eligible for

FMLA leave for her health condition, which was completed by Dr.

Yaknovsky on May 24, 2011. Pl.'s Resp. Ex. 45, FMLA Form. While

Plaintiff was away, URI replaced her air cleaner and "moved

[Mason] to the opposite end of the area." Pl.'s Resp. Ex. 43,

Email Exchange, June 9, 2011.

On September 23, 2011, Plaintiff asked Keenan to again

reiterate the no fragrance policy--informing her that the

fragrance issues "seem[ed] to be getting a little worse every[ ]

day, especially in [her] department and the accounts receivable

department." Pl.'s Resp. Ex. 46, Email Exchange, Sept. 23, 29,

2011. In reference to this complaint, Senior informed Keenan

that another employee, Patti Georgette, told him that "when she

arrived at 7am the fragrance/smell was very strong." Id.

Moreover, on September 29, Plaintiff's coworker Jim Karanzalis--

who replaced Mason as Plaintiff's neighbor--emailed Keenan the

following message:

> It has become increasingly alarming to come into
> work everyday to see the dresscode in my department
> going down the drain. I have people wearing workout
> equipment and men's undershirts with no collar in
> addition to Nike sneakers.In addition , I am not

---

[13]     When Plaintiff returned from this leave of absence,
she was not better able to tolerate fragrances and she continued
to have the same reactions to fragrances that she previously
experienced. Defs.' Br. Ex. A, Pl.'s Dep. 109:11-17.

medically affected by the excessive perfume used by people but today with the excessive amount  from the minute i walked thru the door at 725am it is all i can do to breath air... It was more than enough to send Tina Brady home again in spite of the memo sent around regarding perfume.

Please stroll down to our department if you happen to be walking down to see Nick or Carmen and take in the aroma and sights of my co workers.. Between the perfume and the dress choices of my co workers I have hit a boiling point. I'm pretty easygoing but when everyday is like casual Friday  i had to vent by opinion to a higher authority

Thank you for your anticipated attention in this matter.

Pl.'s Resp. Ex. 47, Email Exchange, Sept. 29-30, 2011 (text unaltered from original email). That same morning, Plaintiff emailed the following message to Keenan:

As I stated last week the perfume situation has gotten worse, this morning in particular. I am sure if you walk in my area, you also will agree, as noted by some of my coworkers who agreed how strong it smells.

Unfortunately, again I had to leave work as soon as I [came] in.

I asked last week if you would reiterate the policy.

Pl.'s Resp. Ex. 48, Email Exchange, Sept. 29, 2011. Later that day, Keenan issued the No Fragrance Memo a fourth time, with some modifications to the text of the earlier versions:

As you are aware we were notified that an employee is sensitive and allergic to fragrances; therefore, I would like to remind you to please be aware that perfume, cologne, and aftershave lotion are no longer permitted at work. This now includes body lotions and sprays. We are sorry if this causes an inconvenience, but it is important to be courteous to our fellow employees.

We will have no alternative put [sic] to take disciplinary action[14] against those employees who do not adhere to this policy.

Should you have any questions, please do not hesitate to contact me.

Pl.'s Resp. Ex. 49, No Fragrance Memo, Sept. 29, 2011.

On October 6, 2011, Senior informed Keenan that Brady identified the source of the fragrance that had been bothering her as fragrance sprayed on the fabric on a panel of her workstation--which was confirmed by Karanzalis and Mason. Pl.'s Resp. Ex. 51, Email Exchange, Oct. 6, 2011. On October 7, Plaintiff notified Senior that she would be absent because of a persisting migraine from the day before, and asked him for an update on whether her desk panel had been changed. Pl.'s Resp. Ex. 52, Email Exchange, Oct. 7, 10, 2011. In response, Senior told Plaintiff that the panels had been cleaned. Id.

On October 6, 2011, URI notified Plaintiff that she was potentially eligible for FMLA leave, Pl.'s Resp. Ex. 54, FMLA Notification Letter, and on October 12, Dr. Saknovsky faxed

---

[14]     In an email to Senior, Keenan emphasized that "it is the supervisors [sic] responsibility to make sure that company policy is enforced. This goes for the . . . no fragrance policy. The supervisor should take disciplinary action if the policies are not followed. There should be warnings, sending the offending party home and if still not followed termination." Pl.'s Resp. Ex. 47, Email Exchange, Sept. 30, 2011. Following this email, Senior notified the employees under his supervision that "[e]ffective immediately, anyone who . . . is not in compliance" with the no fragrance policy should be identified, and "will be subject to disciplinary action." Pl.'s Resp. Ex. 50, Email, Oct. 4, 2011.

to URI a request for medical leave on Plaintiff's behalf--
estimating that Plaintiff would experience three-hour flare-ups
once or twice a week during the period from October 6, 2011
through October 6, 2012. Pl.'s Resp. Ex. 55, FMLA Request
Forms.[15] Plaintiff never learned from URI whether her FMLA
request was approved or denied. See Pl.'s Resp. Ex. 1, Pl.'s
Dep. 156:2-5.

On October 15, 2011, Plaintiff emailed Keenan and
Senior to inform them that as soon as she arrived at work that
morning--trying to make up hours on a Saturday--she began
getting a headache and burning throat, and she discovered

---

[15]    The form also includes the following:

Estimate the part-time or reduced work schedule the
employee needs, if any:

3 hour(s) per day; 2-3 days per week from 10/6/11
through 10/6/12.

Id. Defendants interpret this as representing that "she would
only be able to work '3 hour(s) per day; 2-3 days per week.'"
Defs.' Reply Br. 6, ECF No. 13. Although the plain language of
the form may support Defendants' reading, it would mean that Dr.
Saknovsky recommended that Plaintiff only work six to nine hours
per week, when Plaintiff's flare-ups might occupy only three to
six hours of a given week. Given the dissonance that this
reading produces, the Court recognizes that the doctor may have
read the phrase "or reduced work schedule the employee needs" to
mean by how many hours should the employee's normal schedule be
reduced. Under this reading, the doctor may have been opining
that, on average, Plaintiff's condition would require that she
work six to nine hours less than a full work week. Taking all
factual inferences in favor of the nonmoving Plaintiff, the
Court will read this language in line with the latter
interpretation.

additional perfume spots on another panel of her workstation, as well as on Karanzalis's walls. Pl.'s Resp. Ex. 56, Email, Oct. 15, 2011. On Monday, October 17, 2011, Senior informed Keenan that Plaintiff called him, "reiterate[ing] the information in her Saturday memo" and "indicat[ing] she will return to work once she receives a call that she can work at a workstation/location free from fragrances."[16] Pl.'s Resp. Ex. 58, Email, October 17, 2011.

On the morning of October 18, 2011, Plaintiff came in to work to speak with Keenan and Senior about her desire to find an area in which she can function; Plaintiff was informed that she may not move to an available conference room or an empty desk near her colleague Donna Beaver. See Pl.'s Resp. Ex. 1, Pl.'s Dep. 126:2-20. Later that same morning, and again on the following two days, Plaintiff emailed Senior and Keenan to inquire into the status of the panel replacement and of her medical paperwork. Pl.'s Resp. Ex. 59, Email Exchange, Oct. 18-19, 2011; Pl.'s Resp. Ex. 60, Email, Oct. 20, 2011.

Finally, Plaintiff received the following letter from Keenan, dated October 19, 2011:

Dear Tina,

_____

[16]      Plaintiff does not recall saying that specifically; she believes that she would have said something like "I really need you to give me an area where I could function." Pl.'s Resp. Ex. 1, Pl.'s Dep. 134:21-135:3.

In December of 2010 you first notified us of your condition called multiple chemical sensitivity.

Since that time we have done the following to accommodate your condition to allow you to report to work regularly:

1. Purchased a portable air cleaner for you to use at your work station.

2. Distributed several times a notice to all employees not to wear perfume, cologne or after shave to the office.

3. Another employee has a skin condition requiring her to wear cocoa butter on her skin. You indicated you could not work with the smell of cocoa butter. We purchased face masks for your use.

4. You refused to wear the face masks and still complained about the employee wearing the coca [sic] butter. We moved the other employee to a distant location and ordered a new air cleaner for you, as you broke a knob on the other one.

5. In September you requested we send the notice around to employees again about no fragrances, which we did. You still were unable to work because you said you could smell perfume.

6. You pointed to a specific spot in the fabric of you [sic] work station that had fragrance and we cleaned that panel and then subsequently replaced the panel.

7. We cleaned the rug around your work station.

8. You indicated you think there are perfume spots on other panels in your work station and you can still smell the cocoa butter from the other employees.

9. You consistently miss several days of work a week.

After what we consider to be extraordinary efforts to accommodate you, you have still not been able to consistently perform the essential functions of your job. These accommodations have not allowed you to report to work regularly, which we need you to do. We do not have work available that meets all of your restrictions. Accordingly, effective today you are being laid off.

Pl.'s Resp. Ex. 61, Termination Letter.

## II.   PROCEDURAL HISTORY

Plaintiff filed complaints with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), and received a right to sue letter. She filed the instant action on October 15, 2013, bringing the following claims: (1) interference and retaliation under the FMLA (Count I); (2) disability discrimination under the ADA and the PHRA (Count II); and (3) disability harassment[17] under the ADA and the PHRA (Count III). ECF No. 1. Defendants answered on January 17, 2014 (ECF No. 3), and filed a motion for summary judgment on September 15, 2014 (ECF No. 11). Plaintiff filed a response on October 13, 2014 (ECF No. 12), and Defendants filed a reply[18] on October 27, 2014 (ECF No. 13). This matter is now ripe for disposition.

## III.  LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion

---

[17]      As mentioned <u>supra</u> note 1, Plaintiff voluntarily relinquished her disability harassment claim.

[18]      More specifically, the Defendants filed a motion for leave to file a reply brief--which the Court will grant.

15

for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation; a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (internal quotation marks omitted).

**IV. DISCUSSION**

Defendant's motion for summary judgment asserts that each of Plaintiff's claims fails as a matter of law. Each claim will be considered in turn.

A.  FMLA Interference

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1) (emphasis added). To assert an interference claim, "the employee only needs to show that [s]he was entitled to benefits under the FMLA and that [s]he was denied them." Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005). Further, "the employee need not show that [s]he was treated differently than others," and "the employer cannot justify its actions by establishing a legitimate business purpose for its decision." Id. at 119-20. Hence, "[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." Id. at 120.

Defendants contend that Plaintiff was neither actually denied FMLA leave, nor eligible for such leave. As to the first point, however, the fact that Plaintiff technically "never [received] a final approval or disapproval" of her request for

FMLA leave prior to her termination does not end the inquiry. Pl.'s Resp. Ex. 1, Pl.'s Dep. 156:2-5. Just because Plaintiff's employer may have sat on her request for FMLA leave without deciding to grant or deny it does not mean that Defendant is not legally responsible for denying said leave. And moreover, Defendants did at least constructively deny her request with her firing. As the Third Circuit has held, an employer's termination of an employee who made a valid request for FMLA leave "may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009) (emphasis added).

As for the second point, Defendants have failed to show that, as a matter of law, Plaintiff was ineligible for FMLA leave. Citing to a slew of nonbinding cases,[19] Defendants assert that the leave sought amounted to a request for license to take

---

[19]     The relevant passage reads as follows:

Plaintiff was not eligible for FMLA leave because the FMLA does not entitle an employee to take "unscheduled and unpredictable, but cumulatively substantial, absences" or a right to "take unscheduled leave at a moment's notice for the rest of her life." Collins v. NTN-Bower Corp., 272 F.3d 1006, 1007 (7th Cir. 2001); see also Spangler v. Fed. Home Loan Bank of Des Moines, 278 F.3d 847, 853 (8th Cir. 2002) (same); Hayduk v. City of Johnstown, 580 F. Supp. 2d 429, 454-55 (W.D. Pa. 2008) (same); Brown v. E. Maine Med. Ctr., 514 F. Supp. 2d 104, 110 n.9 (D. Me. 2007) (same).

Defs.' Br. 28.

open-ended, unscheduled leave "at a moment's notice for the rest of her life." Defs.' Br. 28 (internal quotation marks omitted). Defendants argue that the FMLA does not entitle an employee to such indefinite, unpredictable leave.

The statute makes it clear, however, that leave "may be taken intermittently or on a reduced leave schedule when medically necessary." § 2612(b)(1). Additionally, the regulations indicate that leave increments may be less than an hour. See 29 C.F.R. § 825.205. Defendants mischaracterize Plaintiff's request as an open-ended request for indefinite leave--a view that is not faithful to the facts. Even though Plaintiff may not have been able to predict the very hour that she would be stricken by her symptoms, Plaintiff's finite episodes of incapacitation often last only a few hours. See Pl.'s Resp. Ex. 1, Pl.'s Dep. 76:9-14. Viewing the facts in the light most favorable to the nonmoving Plaintiff, her FMLA request appears to have sought approval of a reduced schedule that would both accommodate Plaintiff's frequent flare-ups and permit her to work for a substantial number of hours each week. See supra note 15. Such a request may well fit within the ambit of a proper FMLA request. Accordingly, at this stage in the proceedings, the Court is not convinced that Plaintiff was ineligible for FMLA leave.

As indicated by a letter sent by URI on October 6, 2011, Plaintiff was potentially eligible for FMLA leave. Pl.'s Resp. Ex. 54, FMLA Notification Letter. Defendants do not dispute that URI was subject to the FMLA's requirements, or the fact that Plaintiff gave sufficient notice to Defendants of her need for FMLA leave. Defendants terminated Plaintiff before either approving her request or at least conditionally denying the request subject to additional information provided by Plaintiff or her doctor. Ultimately, the Court finds that disputes of material fact persist regarding Plaintiff's FMLA interference claim, and therefore, the Court will deny summary judgement as to this claim.

B.   FMLA Retaliation

To establish a prima facie claim for FMLA retaliation, a plaintiff "must show that (1) [s]he took an FMLA leave, (2) [s]he suffered an adverse employment decision, and (3) the adverse decision was causally related to [her] leave." Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). The Third Circuit has further stated that the first element does not require that she actually commenced leave, reasoning that "it would be patently absurd if an employer who wished to punish an employee for taking FMLA leave could avoid liability simply by firing the employee before the leave begins." Erdman, 582 F.3d at 508.

"Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012) (parallel citations omitted). Under that approach, once a plaintiff has made out a prima facie case of FMLA retaliation, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its decision. McDonnell Douglas, 411 U.S. at 802. If the defendant meets this minimal burden, the plaintiff must establish that the articulated reason was pretextual by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

### 1.  Prima Facie Case

Defendant does not dispute the first two elements-- that Plaintiff invoked her right to FMLA leave, and that she suffered an adverse employment decision. Thus, whether Plaintiff

has made out a prima facie claim for FMLA retaliation turns on whether Plaintiff has sufficiently shown that the adverse decision was causally related to the invocation of her rights. Defendants assert that Plaintiff has failed to make this showing, as her discharge "resulted from her inability to report to work regularly"--and not from her request for leave. Defs.' Br. 30.

In support of their argument, Defendants point to a few nonbinding cases for the proposition that "an employee cannot establish a prima facie case where the employee suffers an adverse action based on issues that persisted prior to the purported FMLA-qualifying leave." Id. at 30-31 (citing Constant v. Mellon Bank, N.A., No. 03-1706, 2006 WL 1851296, at *9 (W.D. Pa. July 3, 2006); Brown v. DB Sales, Inc., No. 04-1512, 2005 WL 3591533, at *9-10 (E.D. Pa. Dec. 29, 2005); and Helfrich v. Lehigh Valley Hosp., No. 03-5793, 2005 WL 670299, at *20 (E.D. Pa. Mar. 18, 2005)). In each of these cases, however, it was not simply that the plaintiffs exhibited performance issues prior to a request for FMLA leave--rather, the plaintiffs' supervisors brought up alleged performance deficiencies with the plaintiffs before leave was requested. Here, Defendants have not pointed to any instance in which--prior to Plaintiffs' FMLA request--her supervisors expressed concern with excessive absences or any other performance issues. And moreover, logically speaking, simply because an employee may have attendance or performance

22

issues prior to a request for FMLA leave does not necessarily preclude an employer from improperly retaliating against the employee as a result of her request.

Defendants further assert that "Plaintiff has not presented any evidence of retaliation besides the fact that her employment termination occurred after she requested FMLA leave." Id. at 31. Because Plaintiff's argument rests on "mere timing alone," Defendants conclude, it fails to establish the requisite causal connection. Defs.' Reply Br. 11.

Although the Third Circuit has held that "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events," Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997) abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), it has also stated that "if timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997).

Plaintiff's doctor faxed the medical forms and FMLA leave request to Defendants on October 12, 2015. One week later, on October 19, 2015, Keenan authored Plaintiff's termination

letter. Viewing the facts in the light most favorable to the nonmoving Plaintiff, the correlation of these events, mere days apart, may well be "unusually suggestive" of a retaliatory motive. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 285 (3d Cir. 2000) (viewing a matter of "three or four weeks" between alleged causal events and plaintiff's termination as suggestive of retaliation); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (finding plaintiff's termination two days after his employer learned of his EEOC complaint to be sufficiently persuasive evidence of causation). Nevertheless, the Court need not look to timing alone, as other evidence also supports that inference.

In addition to timing, Plaintiff also asserts that an inference of causation is supported by the fact that the "termination letter expressly states that Brady is being terminated because URI cannot accommodate Brady's medical condition for which she had just sought FMLA leave." Pl.'s Resp. 19. Although Defendants contend that they "relied on her inability to report to work regularly, not Plaintiff's request for FMLA leave, in the determination to terminate her employment," Defs.' Br. 31, this conclusory assertion does not erase the possibility that the request may have been the motivating factor behind the decision to dismiss her.

The termination letter states that even after Defendants' "extraordinary efforts to accommodate" Plaintiff, she has "still not been able to consistently perform the essential functions of [her] job." Pl.'s Resp. Ex. 61, Termination Letter. However, this "still" phrasing is at least ambiguous, as Defendants have not pointed to any time prior to this letter in which Plaintiff's supervisors criticized her for deficient performance or failure to perform the essential functions of her job. Apparently until this point, Defendants had been steadily working to at least somewhat accommodate her condition and her recurrent absences. This criticism and the accompanying dismissal came only after Plaintiff submitted her FMLA request for leave/reduced hours--which is available under the statute, see 29 U.S.C. § 2612(b)(1)--for the period of October 6, 2011, through October 6, 2012. Pl.'s Resp. Ex. 55, FMLA Request Forms. Viewed in this context, and taking all factual inferences in favor of the nonmoving Plaintiff, the termination letter appears to convey Defendants' unwillingness to accommodate Plaintiff's FMLA request--which resulted in Plaintiff's firing. Accordingly, Plaintiff has satisfied her required showing of causation, and has thus made out a prima facie case of FMLA retaliation.

2.  Evidence of Pretext

As mentioned earlier, upon a plaintiff's prima facie
showing of retaliation, the burden then shifts to the employer
to provide a legitimate, nonretaliatory explanation for the
adverse employment action. If the employer offers a sufficient
rationale, the plaintiff must then prove by a preponderance of
the evidence that the explanation offered by the employer is a
pretext for discrimination. Fuentes, 32 F.3d at 763. Here,
Plaintiff does not dispute that Defendants "have articulated a
legitimate, non-retaliatory reason for her termination--namely,
Plaintiff's inability to report to work regularly." Defs.' Br.
31. Defendants also assert that "Plaintiff cannot demonstrate
that Defendants' stated reason for terminating her employment
was a pretext for retaliation." Id. However, for the same
reasons stated supra pp. 23-25--concerning Plaintiff's evidence
of causation--Plaintiff has offered sufficient evidence to
"disbelieve the employer's articulated legitimate reasons."
Fuentes, 32 F.3d at 764.[20] Hence, the Court will deny summary

--------

[20]     Defendants also argue that "the fact that Defendants
allowed Plaintiff to continue working for five months after she
requested FMLA leave in May 2011 belies any suggestion of
retaliatory animus." Defs.' Br. 32. But this leap of logic falls
flat, as the May and October requests for FMLA leave were quite
distinct from one another. Whereas the May request was only for
a single period of leave, the October request was for a reduced
work schedule over a longer period of time. If anything, this
very distinction further supports the inference that the October

judgment as to Plaintiff's FMLA retaliation claim against Defendants.

C.    Disability Discrimination

Under the ADA,[21] it is unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To make out a prima facie case of disability discrimination under the ADA, a plaintiff "must establish that she (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." Turner v. Hershey Chocolate USA, 440 F.3d 604, 611 (3d Cir. 2006). Once a plaintiff has made out a prima facie case of discrimination, the McDonnell Douglas burden-shifting inquiry--mentioned supra pp. 20-21--comes into play.

---

request was a moving force behind Defendants' decision to dismiss Plaintiff. Thus, Defendants' point is unavailing.

[21]    Because disability discrimination claims under the ADA and the PHRA are treated coextensively, see Slagle v. Cnty. of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996), the Court will refer only to the ADA for simplicity's sake.

1.  Prima Facie Case

Defendants argue that Plaintiff has failed to establish each element of her prima facie case of disability discrimination. The Court will take each element in turn.

a.  Element One: "Disabled" Under the ADA

An individual is considered disabled if she: "(A) [has] a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) [has] a record of such an impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(1). Defendants argue that Plaintiff has failed to establish disability under any of these three definitions. Because the Court finds that Plaintiff has sufficiently shown that she suffered from "a physical or mental impairment that substantially limits one or more major life activities," the Court need not reach the latter two definitions.

As to the first definition of "disabled" under the ADA, Defendants contend that "Plaintiff cannot establish that she is disabled because she has not, and cannot, provide any evidence that she was substantially limited in a major life activity." Defs.' Br. 12. "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(2)(A). The term

"substantially limits" is to "be construed broadly in favor of expansive coverage," and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

In her Complaint, Plaintiff asserts that her condition "substantially limit[s]" a number of "major life activities" for her, including "breathing, thinking, concentrating, perception, taste, and work." Compl. ¶ 33. And contrary to Defendants' argument that "Plaintiff has presented no evidence to establish that she was substantially limited in her ability to breathe, concentrate or work, or that she suffered a physical or mental impairment that substantially limited one or more of her major life activities," Defs.' Br. 12,[22] Plaintiff has offered sufficient evidence of her "substantial limitations."

In the last five years of her employment with URI, Plaintiff sought medical care from a number of physicians and specialists for her sensitivity to fragrances. See Pl.'s Resp. Exs. 16-20, Medical Reports. She allegedly experienced frequent debilitating headaches that often left her unable to concentrate

_____

[22]     Defendants point out that Plaintiff is apparently "capable of working, eating, walking, caring for herself, pursing [sic] her hobbies and interests outside the workplace (e.g., shopping, attending sporting events, coloring her hair)," even though these environments are not fragrance-free. Defs.' Br. 12-13. But Plaintiff is not expected to spend eight hours shopping or coloring her hair in the same confined space each day. At most, this point merely raises a disputed issue of material fact--and as such, it does not warrant summary judgment at this stage of the proceedings.

or focus for a number of hours, see Pl.'s Resp. Ex. 1, Pl.'s

Dep. 73:3-14, 76:9-14, 77:4-15, and she provided substantial

medical documentation of her condition to URI. See Pl.'s Resp.

Ex. 30, Doctor's Note, Dec. 15, 2010; id. Ex. 44, Disability

Certificate; id. Ex. 45, FMLA Form; id. Ex. 55, FMLA Request

Forms. Viewing the facts in the light most favorable to the

nonmoving Plaintiff, the Court finds that she has sufficiently

shown that she suffers from a disability under the ADA.[23]

---

[23]    Defendants also observe that the ADA Amendments Act of
2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, which
became effective January 1, 2009, relaxed the standard for what
constitutes a disability under the ADA--but the PHRA's standard
has remained the same. Defs.' Br. 13-14 & n.7 (citing Rocco v.
Gordon Food Serv., 998 F. Supp. 2d 422, 428 (W.D. Pa. 2014)
(discussing the district courts that have similarly noted that
"Pennsylvania has not amended the PHRA to remain coextensive
with the ADAAA")). Citing to a few nonbinding cases from other
circuits that confronted smell-sensitivity Plaintiffs under the
narrower pre-ADAAA definition of "substantial limitation," the
Defendants argue that the Court should "find that Plaintiff is
not disabled" under the PHRA. Id. at 14 (citing Milton v. Tex.
Dep't of Criminal Justice, 707 F.3d 570, 573-74 (5th Cir. 2013);
Lang v. Astrue, No. 09-1083, 2011 WL 2149914, at *1, *4 (S.D.
Cal. June 1, 2011)). Even under the pre-ADAAA approach, however,
the specific circumstances of the instant case support
Plaintiff's claimed disabled status.

        In Mondzelewski v. Pathmark Stores, Inc., a pre-ADAAA
case, the Third Circuit described what the then-applicable
regulations required on the issue of "substantial limitations":

        As provided by the regulations, the phrase
        "substantially limits" means "[u]nable to perform a
        major life activity that the average person in the
        general population can perform" or "[s]ignificantly
        restricted as to the condition, manner or duration
        under which an individual can perform a particular
        major life activity as compared to the condition,

b.   Element Two: "Qualified" Under the ADA

The ADA defines a "qualified individual" as one "who,
with or without reasonable accommodation, can perform the
essential functions of the employment position that such
individual holds or desires." 42 U.S.C. § 12111(8). This inquiry
can be divided into two parts: "(1) whether the individual has
the requisite skill, experience, education and other job-related
requirements of the position sought, and (2) whether the
individual, with or without reasonable accommodation, can perform
the essential functions of that position." Turner, 440 F.3d at
611 (citing 29 C.F.R. § 1630.2(n)). "Reasonable accommodations"
are "[m]odifications or adjustments to the work environment, or

---

manner, or duration under which the average person in
the general population can perform that same major
life activity." 29 C.F.R. § 1630.2(j)(1)(i), (ii). The
regulations further provide that, in assessing whether
a major life activity has been substantially limited,
a court should consider the following factors:
"(i) [t]he nature and severity of the impairment;
(ii) [t]he duration or expected duration of the
impairment; and (iii) [t]he permanent or long term
impact, or the expected permanent or long term impact
of [the impairment] or resulting from the impairment."
29 C.F.R. § 1630.2(j)(2)(i)-(iii).

162 F.3d 778, 782-83 (3d Cir. 1998). Again viewing the facts in
the light most favorable to the nonmoving Plaintiff, substantial
evidence indicates that Plaintiff's condition is severe; that its
duration has been and is expected to be of significant length;
and that it is expected to continue to have a substantial long-
term impact on Plaintiff's health, well-being, and productivity.
Accordingly, Plaintiff has established her disabled condition
even under the narrower pre-ADAAA standard.

to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

Defendants do not argue that Plaintiff lacked "the requisite skill, experience, [or] education" for her position. Rather, they argue that Plaintiff "cannot demonstrate that there was a reasonable accommodation that would have allowed her to perform the essential functions of her position"--in particular, regular attendance at work. Defs.' Br. 17. In this vein, Defendants point out that "Plaintiff repeatedly left work early, missed days of work, and submitted documentation to URI indicating that she would be out of work for an undetermined period of time and, when she returned to work, she would 'need to leave the office when smell becomes over the threshold of tolerance.'" Id. (quoting Defs.' Br. Ex. A, Pl.'s Dep. 155:6-7). Again citing to a raft of nonbinding cases, Defendants assert that "[t]he ADA does not protect persons with erratic and unexplained absences even when they result from a disability." Id. at 16 (internal quotation marks omitted).

Here, Plaintiffs' circumstances do not involve unexplained absences; rather, Plaintiffs' condition is triggered by stimuli that are at least somewhat within Defendants' power to control. If Defendants' own no fragrance policies are not

being sufficiently administered or enforced, as Plaintiff alleges, see Pl.'s Resp. 22, Defendants may have to accept that Plaintiff must take some time away from that environment.

The Third Circuit has noted that "unpaid leave supplementing regular sick and personal days might, under [some circumstances], represent a reasonable accommodation." Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 671 (3d Cir. 1999); see also Conoshenti, 364 F.3d at 151 ("[T]he federal courts that have permitted a leave of absence as a reasonable accommodation under the ADA have reasoned, explicitly or implicitly, that applying such a reasonable accommodation at the present time would enable the employee to perform his essential job functions in the near future."). Although, as Defendants note, courts have "found that an open-ended and indefinite request" for leave does not constitute a reasonable accommodation, Defs.' Br. 20 (citing Fogleman v. Greater Hazleton Health Alliance, 122 F. App'x 581, 585-86 (3d Cir. 2004) (discussing cases that have so held)), the prospect of Plaintiff taking off a few hours of work when her symptoms flare up (allegedly as a result of Defendants' poorly enforced policies) is distinguishable from an employee who is completely missing in action for months with no end in sight.[24]

---

[24]     Although Plaintiff's request for leave is indefinite in the sense that she does not know which days her condition

33

Plaintiff's FMLA request sought accommodation in the form of temporary leave until the panels of her workstation were thoroughly cleaned or replaced, and in the form of a reduced work schedule--as authorized by statute. See 29 U.S.C. § 2612(b)(1). Taking all factual inferences in the nonmoving Plaintiff's favor, the Court finds that she has sufficiently shown that, with reasonable accommodation in the form of finite periods of medical leave, she was able to perform the essential functions of her position--and was thus a "qualified individual" under the ADA.

### c.    Element Three: Causation

As to the third element, Defendants assert that "[t]here is simply no evidence that Plaintiff was discharged 'because of her disability.'" Defs.' Br. 21. Contrary to this bold declaration, however, the Court finds that Plaintiff has sufficiently established this element of her prima facie case.

Although Defendants assert that "there is no evidence that Ms. Keenan or Mr. Hope made any derogatory comments about Plaintiff's alleged MCS condition," id., Plaintiff's deposition reveals otherwise:

---

will flare up, it is finite in the important sense that--at least according to her ten-month track record--she is usually only out of commission for a matter of a few hours, see Pl.'s Resp. Ex. 1, Pl.'s Dep. 76:9-14, and she is able to return to work and potentially even make up lost time once her symptoms abate, see, e.g., Pl.'s Resp. Ex. 56, Email, Oct. 15, 2011.

Q. With respect to Ms. Keenan, please identify for me every derogatory comment about your scent allergy that you allege she made?

A. One day when I actually went up there, practically crying to her, she you know, looked at me and, like, she was disgusted with me and didn't want to deal with me anymore. And she said, "How do you even go to the mall?"

. . . .

Q. Are there any other comments about your scent allergy that you believe evidence a discriminatory bias by Barbara Keenan?

A. Yes. When I brought things to her attention that, you know, "It's still going on down there, and it's just all over."

    She said, "Well, let's go down and we'll sniff everybody." That [is] exactly what she said to me. "Let's go down and we'll go desk by desk and we'll sniff everybody."

    At that point, really, I said, "Really Barb? Are we really going to do that?" Like, I'm going to go desk by desk and sniff everyone.

    She was making a smart remark to me, because she didn't say, just sit down and let's do something about this. She just looked at me with disgust and let me leave her office because I was so upset.

Pl.'s Resp. Ex. 1, Pl.'s Dep. 162:17-163:22. Viewing this evidence in the light most favorable to the nonmoving Plaintiff, the Court finds that these remarks provide at least some evidence of discriminatory animus or hostility toward Plaintiff's condition.

        Defendants also point out that "Ms. Keenan repeatedly took actions to try to minimize Plaintiff's exposure to

35

fragrances in the workplace, including allowing her to take a two-week leave of absence even though she failed to submit completed FMLA paperwork . . . , which belies any suggestion of discriminatory animus." Defs.' Br. 21. Nevertheless, the fact that Defendants may have taken some measures to address Plaintiff's complaints does not, of itself, prove that she was not discharged because of her disability. From Plaintiff's perspective, "URI and Keenan offered and implemented several ineffective accommodations, including a repeatedly issued but never enforced no fragrance policy, moving her work space near the one person who supposedly was exempt from the no fragrance policy and then leaving Brady there for six months before moving her again." Pl.'s Resp. 22. Presumably, if Defendants had taken their no fragrance policy more seriously--for instance, by instituting and enforcing disciplinary consequences that were mentioned only in the final No Fragrance Memo--then perhaps Plaintiff would not have needed to take as much time off.

The termination letter itself offers further support for Plaintiff's view that she was dismissed because of her disability. In the closing paragraph, Keenan remarks that "[a]fter what we consider to be extraordinary efforts to accommodate you, you have still not been able to . . . report to work regularly, which we need you to do. We do not have work available that meets all of your restrictions. Accordingly,

effective today you are being laid off." Pl.'s Resp. Ex. 61, Termination Letter. In light of Plaintiff's sufficient showing that Defendant <u>could</u> have reasonably accommodated Plaintiff by affording her the requested leave, this letter essentially reads, "because of your disability--which we are no longer willing to accommodate through periodic time off--you are being laid off." For all of these reasons, and viewing the evidence in the light most favorable to the nonmoving Plaintiff, the Court finds that Plaintiff has sufficiently shown that Defendants terminated her because of her disability--thus establishing the third and final element of her prima facie case.

### 2.   Evidence of Pretext

As with Plaintiff's retaliation claim, upon a plaintiff's prima facie showing of disability discrimination, the burden of production then shifts to the employer to provide a legitimate, nondiscriminatory explanation for the adverse employment action. If the employer states a valid nondiscriminatory reason, the plaintiff must then show by a preponderance of the evidence that the explanation offered by the employer is a pretext for discrimination. <u>Fuentes</u>, 32 F.3d at 763. As before, Plaintiff does not dispute that Defendants have provided a legitimate, nondiscriminatory reason for her termination--"namely, Plaintiff's inability to report to work regularly." Defs.' Br. 31. Defendants also assert that

"Plaintiff has nothing more than her subjective belief, mere conjecture and speculation that disability discrimination was the real reason for her employment termination, none of which [is] []sufficient to establish pretext." Id. at 21. However, for the reasons stated supra pp. 34-36--concerning Plaintiff's evidence of causation--this is simply not true, and the Court finds that Plaintiff has offered sufficient evidence to "disbelieve the employer's articulated legitimate reasons." Fuentes, 32 F.3d at 764. Hence, the Court will deny summary judgment as to Plaintiff's disability discrimination claim against Defendants.

## V.    CONCLUSION

For the foregoing reasons, the Court will deny Defendant's motion for summary judgment. An appropriate order follows.